Robert HASTINGS, Petitioner,

v.

EARTH SATELLITE CORPORATION and Continental Casualty Company, Director, Office of Workers' Compensation Programs, U. S. Dept. of Labor, Respondents.

No. 78–1759.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1979.

Decided March 19, 1980.

Certiorari Denied Oct. 14, 1980.
See 101 S.Ct. 281.

Tersh, Boasberg, Washington, D. C., for petitioner.

John C. Duncan, III, Washington, D. C., for respondents Earth Satellite Corp., et al.

Mary A. Sheehan, Atty., Dept. of Labor, Washington, D. C., for respondent Director, Office of Workers' Compensation Programs.

Cornelius S. Donoghue, Jr., and Gilbert T. Renaut, Attys., Dept. of Labor, Washington, D. C., entered appearances for respondent Director, Office of Workers' Compensation Programs.

William J. Donnelly, Jr., Washington, D. C., entered an appearance for respondents Earth Satellite Corp., et al.

Before McGOWAN and WILKEY, Circuit Judges, and GESELL,[*] United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge McGOWAN.

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The District of Columbia Workmen's Compensation Act, D.C.Code § 36–501 et seq., incorporates by reference the substantive provi-

McGOWAN, Circuit Judge:

This case presents for review an order of the United States Department of Labor's Benefits Review Board awarding compensation to petitioner Robert Hastings. At issue are complex questions of calculating benefits under the District of Columbia Workmen's Compensation Act.[1] For the reasons set forth below, we think the Board erred in certain respects in computing petitioner's benefits. We therefore reverse in part, and remand.

I

The facts of this case, set forth here as found by an Administrative Law Judge (ALJ), are not challenged in this petition for review. Petitioner Hastings was the secretary, treasurer, and comptroller of Earth Satellite Corp., a District of Columbia consulting firm. His annual salary was $30,000. Earth Satellite interprets aerial photography for private companies and the government. Earth Satellite, in which Hastings had invested heavily, needed an infusion of new capital early in 1971. Hastings, under great pressure to put together a financial package, found himself working an average of 60 hours per week.

Hastings suffered a stroke on April 1, 1971. After hearing conflicting medical testimony, the ALJ found that the stroke was caused by job stress.

Hastings convalesced for ten months. He returned to work on February 8, 1972, and was employed on a part-time basis for about two years. Earth Satellite paid Hastings at the same rate as his previous salary, prorated for the number of hours he worked. Although Hastings worked an average of only 50 hours per month over the two-year period, his time on the job gradually increased between 1972 and 1974.[2]

sions of the federal Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1976) (the Act).

2. Hastings reported the following number of working hours:

In March 1974, however, Hastings experienced shortness of breath. He was hospitalized on March 14, and nearly died. A physician determined that Hastings was suffering from pulmonary emboli and phlebitis. The ALJ found, on the basis of conflicting medical evidence, that both ailments were caused by prolonged periods of sitting at work. Hastings is susceptible to a relapse of phlebitis if he sits for a prolonged period. Moreover, he continues to suffer residual effects of the stroke: fatigue, speech impairment, and reduced mental acuity. For all these reasons, Hastings' physician advised him not to resume similar work.[3]

## II

Hastings filed separate claims for the stroke and the emboli.[4] The ALJ heard evidence on both claims at the same hearing. The ALJ thought that compensation should be calculated by dividing Hastings' disabilities into three phases. The first was the period between April 1, 1971, and February 8, 1972. That was the time Hastings convalesced following his stroke. The second was the period between February 8, 1972, and March 14, 1974, when Hastings worked part-time for Earth Satellite. The third was the period after March 14, 1974, during which Hastings has been unable to work.

The Act requires the ALJ to calculate benefits by assessing both the magnitude and duration of Hastings' disability. Phase I was a period of "temporary-total" disability, according to the ALJ. Compensation for this kind of disability is set by section 8(b) of the Act, 33 U.S.C. § 908(b) (1976).[5] That section authorizes the payment of $70 [6] or two-thirds of the claimant's average weekly wage, whichever is the lesser amount. Hastings' average weekly wage, based on his prior annual salary of $30,000, was about $577. The ALJ therefore awarded Hastings the statutory maximum of $70 per week of Phase I of his disability.

Phase II was characterized as a period of "permanent-partial" disability. Compensation for this kind of disability is governed by section 8(c) of the Act, 33 U.S.C. § 908(c)

| 1972 | | |
|---|---|---|
| Feb. 21 | Nov. 61 | July 50 |
| March 53.5 | Dec. 50 | Aug. 55 |
| April 58 | | Sept. 50 |
| May 53.5 | 1973 | Oct. 0 |
| June 43.5 | Jan. 49.5 | Nov. 67 |
| July 49.5 | Feb. 52 | Dec. 38 |
| Aug. 50 | March 33 | |
| Sept. 31.5 | April 55 | 1974 |
| Oct. 31 | May 66 | Jan. 81 |
| | June 61 | Feb. 77 |

J.A. 75–82. Some months in which lesser amounts of work were done may be attributable to vacation periods. *See* Reply Brief for Petitioner, Appendix A.

3. Medical evidence received by the ALJ suggested that Hastings was capable of, and indeed might benefit from, part-time work delivering packages on foot. The employer carries the burden of showing the availability of such alternative work, but no evidence on this subject was offered. The ALJ, therefore, properly treated Hastings as totally disabled.

4. The claim form for the emboli was filed March 6, 1975. The claim form for the stroke was filed June 14, 1976. The ALJ held that the one-year statute of limitations did not bar the stroke claim because Earth Satellite had waited until April 22, 1976, to file required accident report forms. The forms should have been filed within ten days of the stroke. 33 U.S.C. § 930(a) (1976). The ALJ held that the statute of limitations was tolled until the employer reported the accident, *id.* § 930(f).

5. Section 8(b) provides:

Temporary total disability: In case of disability total in character but temporary in quality 66⅔ per centum of the average weekly wages shall be paid to the employee during the continuance thereof.

6. Section 6(b) of the Act, 33 U.S.C. § 906(b) (1970; Historical Note, 1976), formerly limited recovery to $70 per week. That provision was repealed in 1972, Pub.L. No. 92–576, § 5(e), 86 Stat. 1252, and replaced with limitations indexed to increases in the national average weekly wage. *See* 33 U.S.C. § 906(b) (1976). The parties agree that the $70 limitation, not the changes wrought by the 1972 amendments, is applicable to the compensation award for disability resulting from the stroke. Relevant to another issue in this appeal, *see* text accompanying note 9 *infra*, is the fact that the maximum was $210.54 for injuries occurring between October 1, 1973, and September 30, 1974.

(1976).[7] That section authorizes payment of $70 or two-thirds of the difference between the claimant's former earning capacity and his current average weekly wage; once again, the lower amount is to be paid. *Id.* § 908(c)(21); *see* note 6 *supra.* The ALJ thought there was no need to determine the extent of Hastings' lost earning capacity because the $70 ceiling was clearly applicable. Accordingly, the ALJ awarded Hastings $70 per week for Phase II.

Phase III, the period following the emboli, was deemed by the ALJ to be a period of "permanent-total" disability. Compensation for this kind of disability is governed by section 8(a) of the Act, 33 U.S.C. § 908(a) (1976).[8] The statute requires paying the lesser of $210.54[9] or two-thirds of the disabled person's "average weekly wages."[10]

Hastings earned $9,228.80 in the 12 months preceding the emboli. The ALJ calculated Hastings' average weekly wages simply by dividing $9,228.80 by 52: $177.48 per week. The ALJ thus awarded Hastings two-thirds of that amount—$118.32—each week for life as compensation for the permanent-total disability.

The ALJ further ordered that the Phase II permanent-partial disability award (resulting from the stroke) should end at the time the Phase III permanent-total disability award (following the emboli) began. The ALJ held, finally, that Earth Satellite was liable only for 104 weeks of Phase III payments, and that the "special fund" established by the Act[11] must assume the obligation after 104 weeks.

---

7. Section 8(c)(21) provides, in pertinent part:
   (c) Permanent partial disability: In case of disability partial in character but permanent in quality  .   .   .:
   \*      \*      \*      \*      \*      \*
   (21) .   .   . [C]ompensation shall be 66⅔ per centum of the difference between his average weekly wages and his wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of such partial disability, but subject to reconsideration of the degree of such impairment by the deputy commissioner on his own motion or upon application of any party in interest.

8. Section 8(a) provides, in pertinent part:
   Permanent total disability: In case of total disability adjudged to be permanent 66⅔ per centum of the average weekly wages shall be paid to the employee during the continuance of such total disability.

9. *See* note 6 *supra.*

10. The term "average weekly wages" is defined in section 10(d) of the Act, 33 U.S.C. § 910(d) (1976), as one fifty-second part of the worker's average annual earnings. The average annual earnings are computed in the following manner:
    (a) If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of three hundred times the average daily wage or salary for a six-day worker and two hundred and sixty times the average daily wage or salary for a five-day worker, which he shall have earned in such employment during the days when so employed.
    (b) If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings, if a six-day worker, shall consist of three hundred times the average daily wage or salary, and, if a five-day worker, two hundred and sixty times the average daily wage or salary, which an employee of the same class working substantially the whole of such immediately preceding year in the same or in similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed.
    (c) If either of the foregoing methods of arriving at the average annual earnings of the injured employee cannot reasonably and fairly be applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the services of the employee if engaged in self-employment, shall reasonably represent the annual earning capacity of the injured employee.
    Section 10 of the Act, 33 U.S.C. § 910 (1976).

11. Section 44 of the Act, 33 U.S.C. § 944 (1976), establishes a "special fund" from which certain payments are made pursuant to the Act. The special fund is composed of money paid by insurers and employers each year to spread the risk of large disability liabilities. *Id.* § 44(c), 33 U.S.C. § 944(c) (1976). The Act

## III

Both Hastings and the Director, Office of Workers' Compensation Programs (the Director), appealed the ALJ's decision to the Benefits Review Board (the Board). Hastings contended that the ALJ erred in computing the salary upon which compensation should be based. The Director argued that the ALJ erred (1) in requiring the special fund to assume part of the employer's liability, and (2) in terminating the permanent-partial compensation for the stroke on the date Hastings suffered the emboli.

The Board rejected Hastings' argument, and the Director's first argument, and affirmed the ALJ in each respect. The Board did, however, accept the Director's second argument and endorsed concurrent awards for permanent-partial and permanent-total disability. The Board, accordingly, modified the ALJ's decision by requiring the employer to continue to pay $70 per week for permanent-partial disability until $24,000 had been paid,[12] notwithstanding the commencement of payments for permanent-total disability. We briefly summarize each of these decisions.

### A. *The Salary Basis for the Permanent-Total Disability Award*

Hastings contended that the ALJ erred in determining the salary basis of payments for permanent-total disability. Hastings was earning $30,000 per year at the time of the 1971 stroke, and he argued that this figure, rather than his part-time earnings between the stroke and the emboli, should have been the basis for a permanent-total disability award.

The Board disagreed. It noted that the statute authorized payment of two-thirds of the claimant's "average weekly wages." *See* sections 8(a), 10 of the Act, 33 U.S.C.

§§ 908(a), 910 (1976), *quoted in* notes 8, 10 *supra*. The Board held that the ALJ correctly computed average weekly wages of $177.48 by dividing Hastings' earnings for the year preceding the emboli—$9,228.80—by 52. The Board thought this calculation was compelled by the language of the statute, namely, that the basis for compensation is the average weekly wage of the injured employee "*at the time of the injury.*" Section 10(d) of the Act, 33 U.S.C. § 910(d) (1976) (emphasis added). That Hastings *formerly* earned a much higher salary was irrelevant, the Board held.

### B. *The Liability of the Special Fund*

When a worker with a permanent-partial disability becomes totally and permanently disabled because of a combination of both disabilities, the employer at the time of the permanent-total disability is liable only for 104 weeks of compensation, *id.* § 8(f)(1), 33 U.S.C. § 908(f)(1) (1976), and the special fund assumes responsibility for the remaining payments, *id.* § 8(f)(2), 33 U.S.C. § 908(f)(2) (1976). The ALJ attributed Hastings' permanent disability to the combined impact of his earlier stroke and the subsequent, distinct attack of phlebitis and emboli. Accordingly, the ALJ ordered the special fund to pay Hastings after Earth Satellite had paid the first 104 weeks.

The Director argued, however, that because the emboli and phlebitis were directly related to the stroke, and not a separate "subsequent injury," Earth Satellite should be liable for the entire permanent-total disability. The Board rejected this argument. It noted that the ALJ had found that the phlebitis and emboli were caused or aggravated by his sedentary desk job. The ALJ had *not* found that the phlebitis and emboli were caused by the stroke. Section 8(f) of

---

authorizes payments from the fund, *inter alia*, to a worker who, after resuming work following a permanent-partial disability, suffers permanent-total disability attributable to both injuries. *Id.* § 8(f), 33 U.S.C. § 908(f) (1976). Under section 8(f), the special fund takes over payments to the worker after the employer has made 104 weeks of disability payments for the second injury.

**12.** Section 14(m) of the Act, 33 U.S.C. § 914(m) (1970; Historical Note, 1976), limited recovery for disability (other than permanent-total disability or death) to $24,000. That provision was repealed in amendments to the Act in 1972 (the 1972 Amendments). Pub.L. No. 92–576, § 5(e), 96 Stat. 1252 (1972).

the Act requires payments from the special fund to avoid penalizing an employer who hires—or rehires—a handicapped individual. The special fund, not Earth Satellite, therefore must be liable, the Board concluded.

### C. The Length of the Permanent-Partial Award for the Stroke

The Director next argued that the ALJ erred in terminating the permanent-partial award (resulting from the stroke) at the onset of total disability. The Board agreed, holding that Earth Satellite should have continued to pay $70 per week for permanent-partial disability until the $24,000 statutory maximum was reached. This approach in effect created a system of concurrent awards, because the permanent-partial award for the stroke was to be paid even during the payment of the permanent-total award following the emboli. The Board held:

> Nothing in the Act indicates that payments on an award for permanent partial disability should terminate when a later injury occurs rendering the claimant permanently totally disabled. The claimant's average weekly wages at the time of the second injury, upon which the award of permanent total disability is based under Section 10 of the Act, 33 U.S.C. § 910, presumably already reflect a reduced earning capacity resulting from the previous injury. The award for the permanent partial disability should not have terminated even though the claimant was later permanently totally disabled.

J.A. 90.

### IV

Presented here for review are several questions arising from the Board's decision. We must decide

(1) whether the Board correctly refused to base the permanent-total disability award on Hastings' salary *before* the stroke;

(2) if so, whether the Board's system of concurrent awards for permanent-partial and permanent-total disability is authorized by the Act; and

(3) if the basic structure of the Board's award is sound, whether the Board correctly calculated ( *a* ) the permanent-partial component by limiting it to $24,000; and ( *b* ) the permanent-total component by basing it on Hastings' average weekly earnings for the year preceding the emboli.

### A

■ We think the Board correctly refused to base the permanent-total disability award on Hastings' salary before the first injury, the stroke. The Act bases benefit computations on the worker's "average weekly wages." Section 8(a) of the Act, 33 U.S.C. § 908(a) (1976), *quoted in full in* note 8 *supra.* The Act carefully defines that term. It provides, in pertinent part:

> . . . [T]he average weekly wage of the injured employee *at the time of the injury* shall be taken as the basis upon which to compute compensation . . ..

*Id.* § 10, 33 U.S.C. § 910 (1976) (emphasis added). Where, as here, *two* injuries befall an employee, the employee's earning capacity during the time preceding the second injury must be the basis of computing benefits attributable to the second injury.

Hastings cites section 2(13) of the Act, 33 U.S.C. § 902(13) (1976), as support for his theory that his compensation should be based on his earnings before the first injury. That section provides, in pertinent part:

> "Wages" means the money rate at which the service rendered is recompensed
> . . . . .

Hastings argues that the "money *rate*" paid before the stroke—$30,000 per year— was identical to the "money *rate*" paid after the stroke—$30,000 per year prorated for the number of hours worked.

We think Hastings misinterprets both the Act and the part-time employment arrangement he had with Earth Satellite. Hastings' strained reading of the *definitional* section of the Act cannot be used to subvert

the benefits formula carefully specified by section 10. In addition, Hastings confuses the nature of his pay arrangement with the company. He was employed on an hourly basis for an unspecified amount of part-time work. His $14.42 hourly rate was, of course, derived from his prior salary, but he was paid only for the number of hours *actually worked.* Thus, Hastings cannot be deemed to have been paid at the rate of $30,000 per year, because his earnings would have totalled $30,000 only had he been able to work full time.

### B

■ We think, also, that the Board's scheme of concurrent awards for both permanent-partial disability (for the stroke) and permanent-total disability (for the cumulative effects of both stroke and emboli) was appropriate. This conclusion is compelled by our reasoning in the preceding section of this opinion. In that section, we based compensation for Hastings' permanent-total disability on his diminished earning capacity, not on the $30,000 per year earning capacity he possessed before the stroke. Because compensation for his original loss of earning capacity was already addressed in the permanent-partial award, logic and fairness require that the permanent-partial disability award continue concurrently with the permanent-total award.

A hypothetical makes this clear. Consider a worker earning $10,000 per year. An accident permanently reduces his earning capacity to $6,000. He is awarded compensation based on the $4,000 diminution in his earning capacity. A second accident disables him totally. The second compensation award is based on the $6,000 in earning capacity remaining after the first accident. Terminating the first award at the onset of the second would deprive the worker of compensation for the permanent loss of $4,000 in earning capacity. Paying the two awards concurrently, however, compensates him fully. The sum of the two awards reflects the full $10,000 diminution in earning capacity.

This reading of the Act might give rise to an anomaly, namely, that a twice-injured, permanently disabled worker might receive a larger award than a worker who had become permanently disabled in a single injury. The anomaly could arise because of the ceilings on awards imposed by section 6(b) of the Act, 33 U.S.C. § 906(b) (1976). In 1974, for example, the weekly ceiling was $210.54. Consider a worker earning $600 per week, who becomes injured and can earn only $300 per week. The worker is entitled to compensation for the diminution of his earning capacity. His weekly compensation is two-thirds of $300, or $200 per week. Suppose now that a second accident befalls the same worker, leaving him totally disabled. Compensation for the second injury is two-thirds of $300, or $200 per week. The sum of the awards, using the concurrent award approach described above, is $400 per week.

Consider now a second worker who, like the first, initially earned $600 per week. Suppose that the second worker, unlike the first, becomes totally disabled in a single accident. The diminution in earning capacity is $600 per week, and recovery ought to be two-thirds of $600, or $400 per week. The section 6(b) maximum, however, limits recovery to $210.54 per week. Thus, one totally disabled worker might obtain $400 per week in benefits while one with equal earning capacity, also totally disabled, obtains barely half that amount. The difference occurs only because the first worker became totally disabled in two consecutive injuries while the second worker became totally disabled in only one.

Concurrent awards for multiple disabilities might, in this unusual case, aggregate to an amount greater than the section 6 maximum for a single totally disabling injury. This specter does not indicate a flaw in the system of concurrent awards; rather, it is caused by the existence of the Act's maximum-payment provisions. Congress is free to amend the statute to eliminate the resulting anomaly.[13]

13. The Director's brief suggests a possible statutory amendment to remove the anomaly described in the preceding paragraphs. Congress could provide that, in the event of multiple

## C

We have thus far found appropriate the *structure* of the Board's award, namely, concurrent awards for permanent-partial disability (based on Hastings' earnings before the stroke) and permanent total disability (based on Hastings' earnings from part-time work). Remaining to be decided are the questions (1) whether the permanent-partial award should be limited by the $24,000 ceiling that was repealed after Hastings' stroke, and (2) whether the Board accurately computed Hastings' "average weekly wages" during the period of part-time work for purposes of paying permanent-total disability.

### 1

■ Section 14(m) of the Act formerly limited permanent-partial recoveries to $24,000. 33 U.S.C. § 914(m) (1970; Historical Note, 1976). That limitation was repealed in 1972, after Hastings suffered his stroke. Pub.L. No. 92–576, § 5(e), 86 Stat. 1252 (1972). The Board thought that, because the stroke preceded the repeal, the limitation was applicable to the permanent-partial disability component of Hastings'

award. The Board, accordingly, ordered that payments cease when $24,000 had been paid. We disagree.[14]

The principles by which we must pass upon the retroactivity *vel non* of the repeal of the $24,000 limitation were explained by the Supreme Court in *Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). We are instructed to apply the amendment unless there is statutory direction or legislative history to the contrary or unless to do so would be manifestly unjust. *Id.* at 711, 94 S.Ct. at 2016.

We find no congressional intention that the repeal not be applied retroactively. The statutory language, to be sure, does not specifically *require* retroactive application of the repeal. We think, though, that the absence of a provision *prohibiting* retroactivity is significant. Congress before 1972 had thrice amended the Act's benefit limitations. Each prior amendment was, by its terms, made inapplicable to injuries or deaths occurring before the date of enactment.[15] The 1972 Congress, by its silence,

---

recoveries that would exceed the single-award maximum, the Board should limit compensation for *each* injury to the equivalent percentage of the section 6 maximum. Brief for Director at 19.

**14.** We reject Earth Satellite's threshold argument that the question of the retroactivity of section 14(m)'s repeal was not properly preserved for review. The $24,000 limitation did not become relevant until the Board reversed the ALJ by adopting the framework of concurrent awards. (Under the ALJ's approach, the permanent-partial disability payments were to cease at the onset of permanent-total disability. The permanent-partial component never would reach $24,000 under this approach.) Hastings, by raising the $24,000 limitation issue in this court, has raised it at the first opportunity after the Board's decision made it relevant.

It is true that Hastings should have requested the Board to apply retroactively the repeal of section 14(m) in the event the Board adopted a concurrent award scheme. However, the special circumstances of this case make us disinclined to insist on overly strict procedural requirements. The Board has clearly taken the view that the repeal of section 14(m) should not be applied retroactively. *Davis v. George*

*Hyman Constr. Co.*, 9 B.R.B.S. 127 (1978); *Correia v. General Dynamics Corp.*, 8 B.R.B.S. 602 (1978); *Vinson v. Avondale Shipyards, Inc.*, 8 B.R.B.S. 597 (1978); *Swann v. George Hyman Constr. Co.*, 3 B.R.B.S. 490 (1976); *Salusky v. Army Air Force Exch. Serv.*, 3 B.R.B.S. 22 (1975); *Hayes v. Independent Stevedoring Co.*, 1 B.R.B.S. 264 (1975). It is therefore highly unlikely that the Board would have changed its mind in this case had it again been asked to consider the issue. In any event, the question of the retroactivity of a statutory amendment is purely one of law. We are not disadvantaged under these circumstances in considering the issue ourselves in the first instance, nor can Earth Satellite reasonably claim that it has been prejudiced by our doing so.

**15.** The Act of July 14, 1961, Pub.L. 87–87, § 3, 75 Stat. 203 established the $24,000 limitation repealed in 1972. The prior ceilings were set by the Act of July 26, 1956, c. 735, § 5, 70 Stat. 654, 655 (ceiling of $17,280) and the Act of June 24, 1948, c. 623, § 5, 62 Stat. 602, 603 (ceiling was $11,000, except for certain permanent-partial disability payments that were subject to a $10,000 ceiling). Each of these Acts contained provisions limiting their applicability to injuries occurring after the effective date of the Act.

deviated from the past practice of specifically providing for nonretroactivity.[16]

It is also useful to consider the kinds of changes wrought by the 1972 Amendments. Some of the changes have been held to apply only prospectively. Others have been applied retroactively. Comparing the nature of the other amendments with the change in law effected by section 14(m)'s repeal makes it apparent that the $24,000 limitation is inapplicable to this case.

Certain of the 1972 Amendments change principles of substantive law. Amendments of this sort affect the rights and liabilities of persons and businesses in the maritime industry. These amendments, *inter alia*, (1) eliminated a shipowner's liability to a longshoreman for injuries caused by the unseaworthiness of the ship,[17] (2) abrogated the shipowner's right of indemnity against the stevedoring company that employed the longshoreman,[18] and (3) extended the Act's protection to certain workers engaged in maritime employment who were not previously covered.[19]

Certain other of the amendments, however, dealt not with liability *vel non*, but with the remedy or the mode of its enforcement. The Amendments, *inter alia*, (1) provided for the payment of attorney's fees,[20] and expanded the time limitation for filing compensation claims.[21]

Where Congress fails to make its intentions absolutely clear, courts are much more inclined to apply retroactively amendments directed at the *remedy* rather than changes in *substantive rights*. See Cooper Stevedoring of Louisiana, Inc. v. Washington, 556 F.2d 268, 271–73 (5th Cir. 1977). Retroactive modification of remedies normally harbors much less potential for mischief than retroactive changes in the principles of liability. Persons and employers must be able to base their conduct on what they believe the law to be. Retroactive creation of legal responsibilities or abolition of legal rights risks unfairness because the retroactive change confounds the expectations upon which persons acted.

Retroactive modifications in remedy, on the other hand, often do not involve the same degree of unfairness. Such modifications do not transform a legal act into an illegal act, or render one responsible to safeguard someone previously thought to act at his peril. Modification of remedy merely adjusts the extent, or method of enforcement, of liability in instances in which the possibility of liability previously was known.[22] For this reason, absent contrary direction from Congress, courts are more

---

**16.** *Cf. C & P Tel. Co. v. Director, OWCP*, 564 F.2d 503, 510 & n.7 (D.C. Cir. 1977) (discussing earlier amendments to section 8 of the Act).

**17.** *See Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986 (1st Cir. 1978) (holding nonretroactive the amendments to certain portions of section 5(b) of the Act, 33 U.S.C. § 905(b)); *Drachenberg v. Canal Barge Co.*, 571 F.2d 912 (5th Cir. 1978) (same).

**18.** *See Addison v. Bulk Food Carriers, Inc.*, 489 F.2d 1041 (1st Cir. 1974) (holding nonretroactive amendments to certain portions of section 5(b) of the Act, 33 U.S.C. § 905(b)).

**19.** *See generally P. C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) (discussing the scope of amended section 2(3) of the Act, 33 U.S.C. § 902(3); no retroactivity issue).

**20.** *See Overseas African Constr. Corp. v. McMullen*, 500 F.2d 1291 (2d Cir. 1974) (holding retroactive the amendments pertaining to section 28(a) of the Act, 33 U.S.C. § 928(a));

*accord, Matthews v. Walter*, 512 F.2d 941 (D.C. Cir. 1975); *Dillingham Corp. v. Massey*, 505 F.2d 1126 (9th Cir. 1974).

**21.** *See Cooper Stevedoring of La., Inc. v. Washington*, 556 F.2d 268 (5th Cir. 1977) (holding retroactive the amended provisions of section 13(a) of the Act, 33 U.S.C. § 913(a)).

**22.** The distinction between retroactive changes in *principles* of liability and changes in *remedies* for such liability does not mean that retroactive changes in remedy cannot also be unfair. They obviously can be so, particularly in the context of insurance. Actuarial calculations are based on the expected *magnitude* of liability in addition to its expected *frequency*. Thus, insurers are harmed when their past premiums prove to be inadequate fully to reflect the increased liability mandated by a retroactive change in remedy. Such is the case with the repeal of section 14(m). Insurers doubtless set their premiums based on the expectation that recoveries would be limited to $24,000.

inclined to apply retroactively changes in remedies than changes in liability.[23] These considerations are particularly powerful in this case. The existence of the $24,000 ceiling in effect allowed the employer to avoid the responsibility for the full costs associated with his enterprise because it deprived his employees of compensation for earning capacity lost in the employer's service. Removing the artificial ceiling, therefore, creates no injustice. It instead removes an obstacle to fair treatment by "allocat[ing] to the [employer] an actual, measurable cost of his business." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 19, 96 S.Ct. 2882, 2894, 49 L.Ed.2d 752 (1976).

We therefore hold that the repeal of section 14(m) applies retroactively to awards for preamendment injuries that had not reached the statutory ceiling before the effective date of the 1972 Amendments.[24] Hastings' compensation must be paid accordingly.[25]

We acknowledge the numerous Board decisions holding that the repeal of section 14(m) is not retroactive. *See* decisions cited in note 14 *supra.* Courts will defer to great extent to a *policymaking* agency's construction of legislation pertaining to that agency. The Benefits Review Board, however, is not a policymaking agency in this sense.[26] The Board's opinion on the retroactivity issue thus is not entitled to our deference. The Board's view accordingly must fail in light of our own analysis.[27]

## 2

The final issue to be resolved is the proper calculation of permanent-total disability payments for the period following

23. Our decision in *Swinton v. J. Frank Kelly, Inc.*, 554 F.2d 1075 (D.C.Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976), is consistent with this view. In *Swinton,* we declined to make retroactive certain amendments pertaining to judicial review of compensation decisions. We noted that to hold otherwise in that case could have deprived the claimant of judicial review of his claim because of the running of the statute of limitations, *id.* at 1080 & nn. 24–26, and in any event would have involved waste of resources of the parties and adjudicators. *Id.* at 1080. Nothing in *Swinton,* therefore, stands for a general rule that remedial changes in the law are not to be applied retroactively.

24. This construction is further supported by the Act's policy of resolving in favor of claimants doubts about questions of fact and law. *See, e. g., Baltimore & Philadelphia Steamboat Co. v. Norton,* 284 U.S. 408, 52 S.Ct. 187, 76 L.Ed. 366 (1932); *Alabama Dry Dock & Shipbuilding Co. v. Kininess,* 554 F.2d 176 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977); *Wheatley v. Adler,* 407 F.2d 307 (D.C. Cir. 1968).

25. Earth Satellite contends that giving retroactive effect to the repeal of the $24,000 limitation would offend due process. This argument is without merit. *E. g., Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *American Stevedores, Inc. v. Salzano,* 538 F.2d 933 (2d Cir. 1976).

26. *Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 48–49 (2d Cir. 1976), *aff'd sub nom. Northeast Marine Term. Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). *Accord, Tri-State Terms., Inc. v. Jesse,* 596 F.2d 752, 757 n.5 (7th Cir. 1979).

27. Counsel for Earth Satellite at oral argument called to the court's attention two sets of circumstances that, according to Earth Satellite, undercut the Director's capacity to advocate retroactive application of section 14(m)'s repeal. Earth Satellite suggested, first, that the Director in some sense has acquiesced in the Board's view that the repeal of section 14(m) is nonretroactive by failing to pursue appeals in those prior decisions. Such purported acquiescence, we are told, precludes (or at least renders suspect) the Director's efforts to raise the issue on appeal now. Second, Earth Satellite points out that Ralph Hartman, the present Director, formerly was a member of the Board. While on the Board, Mr. Hartman voted against the retroactive application of section 14(m)'s repeal. Earth Satellite contends that Mr. Hartman's change of position militates in favor of nonretroactivity.

We emphatically disagree on each point. The Director's strategy about what cases to appeal may result from myriad factors, *e. g.,* allocation of staff attorney time, the amount in controversy in a particular case, the prospects of settlement, and others. The Director's litigation strategy is neither a matter of concern to us, nor in any event relevant to the retroactivity *vel non* of the repeal of section 14(m).

The same is true of Mr. Hartman's voting record as a member of the Board. His *position qua advocate* is a product of factors vastly different from those guiding his *opinions qua adjudicator.* For that reason, Mr. Hartman's employment history also is irrelevant to the issues before us here.

the emboli. The Act authorizes benefits in the amount of two-thirds of Hastings' average weekly wage, 33 U.S.C. §§ 908(a), 910 (1976), up to a maximum of $210.54. *See* note 6 *supra*. The ALJ noted that, in the year preceding the emboli, Hastings earned $9,228.80. The ALJ simply divided that amount by 52 ($177.48) to calculate Hastings' average weekly wage. Two-thirds of that amount—$118.32—became Hastings' compensation.

Hastings contends that this mechanical application of the statutory formula deprives him of benefits to which he is entitled. He points out that, with occasional setbacks, during his period of part-time work he became able to work an increasing number of hours per week.[28] We are told that calculating disability payments based on Hastings' average earnings for the year preceding his stroke insufficiently recognizes his greater activity at the end of the year.

We agree. Concededly, the ALJ and the Board calculated Hastings' benefits in accord with the literal terms of the statutory formula, *id.* §§ 910(a), 910(d), and we are loath to criticize an administrative agency for that. The statute does not, however, elevate mechanical computation above common sense. An ALJ can, and should, adjust the average weekly wage calculation to award benefits that accurately reflect the claimant's true earning capacity.

The existence of this kind of flexibility is apparent both from the statute itself, and decisions construing it. Section 10(c) of the Act, 33 U.S.C. § 910(c) (1976), provides:

(c) If . . . the foregoing method[ ] of arriving at the average annual earnings of the injured employee cannot reasonably and fairly be applied, such *average annual earnings shall be such sum as . . . shall reasonably*

*represent the annual earning capacity of the injured employee.*

(Emphasis added). This section explicitly recognizes that the mechanical formula for benefit computation must be disregarded where the formula would distort a claimant's actual earning capacity.[29]

Appellate cases make clear that section 10(c) requires the ALJ to reject mechanical calculations when necessary to award benefits commensurate with a claimant's true earning capacity. The Court of Appeals for the Seventh Circuit recently decided one such case. *Tri-State Terminals, Inc. v. Jesse*, 596 F.2d 752 (7th Cir. 1979), involved the 1974 injury of one Jesse, longshoreman. He had earned $2,758.74 in the 52 weeks preceding his injury. The ALJ computed benefits based on that figure, but the Benefits Review Board reversed. The Board noted that the year following Jesse's injury was a boom year for longshoremen in his town. Jesse's former co-workers earned approximately three times more in 1974 than they had in 1973. The Board held that Jesse was entitled to compensation based on this increase in earnings, because he would have been able to earn the greater amount had he not been injured.

The Seventh Circuit affirmed the Board. It stated that it would be unjust "to compute loss of earning power on facts which do not realistically reflect it." *Id.* at 758. The court quoted the Board's opinion with approval:

The term "earning capacity" connotes the *potential* of the injured employee to earn and is not restricted to a determination based on previous actual earnings.

*Id.* at 757 (emphasis in original).

Similarly, we think Hastings' "potential to earn" at the time of his final collapse is not well measured by his earnings as much as 12 months earlier. At oral argument of

28. *See* note 2 *supra*. For example, Hastings averaged 46 hours of work per month during the first four months of part-time work. By comparison, during the last four months of part-time work, he averaged about 66 hours.

29. Similarly, section 10(e) of the Act, 33 U.S.C. § 910(e) (1976), specifically recognizes that a

minor's wages "should be expected to increase" over time. The statute, accordingly, instructs the ALJ to consider adjusting upward the average weekly wage computation to reflect more accurately the minor's true earning capacity. *Id.*

this case, Judge Wilkey proposed an analogy that we think is useful. Judge Wilkey observed that one would not gauge the abilities of a weightlifter in training by examining his performances a year before the date of a competition. The amount he can lift is much more accurately reflected by his most recent performances.

So it is, we think, with a worker recovering from a debilitating stroke. Hastings showed he could work an increasing number of hours during the period following his stroke. Hastings' actual working capacity at the time of the emboli is best measured by the amount he worked during the two- or four-week period immediately preceding the emboli.[30] Failure to calculate earning capacity in this manner produces benefits that poorly measure the earning capacity that he had in fact achieved. The refusal properly to use the flexibility provided by section 10(c) is an abuse of discretion that requires remand.

We do not, of course, hold that an ALJ must reject the normal formula whenever there is a prospect of increased earnings in the future. An employer need not pay a claimant more than his current earnings on the speculative possibility that the claimant might have earned more money in the future had injury not occurred. The instant case, however, involves no speculation. All we require is that where, as here, an employee demonstrates a progressive increase (or decrease) in earnings in the year immediately preceding an injury, compensation should not be based on earnings received as much as 12 months before the injury. Instead, a compensation award should be fixed by recognizing the trend in earnings by examining most closely the earnings immediately preceding the injury.

We conclude, in sum, that the Board adopted the correct *framework* for the payment of Hastings' benefits: concurrent awards for permanent-partial disability (running from the time of the stroke) and permanent-total disability (running from the occurrence of the emboli). We think, however, that the Board erred in setting the *dollar amount* of the award in each part of the concurrent-award framework.

---

**30.** Double-accident situations carry the potential for mischief in computation in cases, unlike this one, in which the payments are ordered in separate adjudications. Consider a worker earning $10,000 per year. Suppose one injury befalls him. During the first year after the accident he earns $4,000. His disability claim is litigated, and he receives compensation reflecting the $6,000 diminution in earning capacity. As these compensation payments roll in, he gradually increases his working hours until he earns at the rate of $8,000 per year. Suppose, now, that another injury befalls him and permanent-total disability ensues. How should disability payments now be calculated?

His permanent-total disability payments should reflect his $8,000 per year capacity at the time of the second accident. That, however, would permit "double-dipping" of a sort, because his aggregate disability payments would be based on the loss of $14,000 in earning capacity—$6,000 for the first accident, and $8,000 for the second. This sum represents more earning capacity than he had to begin with. In cases such as this, the award modification mechanism established by the Act should be invoked. 33 U.S.C. § 922 (1976). The initial award, based on a $6,000 loss in earning capacity, resulted in overpayments. The first award should be reduced prospectively to reflect a permanent loss of $2,000 in

earning capacity. The claimant concurrently should receive an award for the permanent loss of $8,000 in earning capacity.

Changes in earnings after adjudication can be predicted to some extent by the careful use of medical testimony at hearings. But medical testimony can be incorrect. When this occurs, adjustments should be made, pursuant to the statutory procedures, to avoid injustice resulting from initially incorrect factual determinations. *See generally O'Keeffe v. Aerojet-General Shipyards, Inc.,* 404 U.S. 254, 92 S.Ct. 405, 30 L.Ed.2d 424 (1971).

The problems discussed in this footnote, of course, do not now confront us because Hastings' compensation for both injuries was determined in a single adjudication. For this reason, we are able to see in hindsight the extent of the disability caused by Hastings' first injury by examining his work record up to the onset of total disability. No prospective recomputation of Hastings' permanent-partial award is necessary in this case because Hastings received the statutory maximum of $70 for the stroke. That award would not change even if the extent of disability caused by the stroke were computed to reflect his increased working capacity demonstrated immediately before the emboli.

First, the Board incorrectly applied the $24,000 ceiling to the permanent-partial award. That ceiling had been repealed and, for reasons set forth above, was inapplicable to Hastings' claim. Second, the Board incorrectly set Hastings' permanent-total disability award by failing accurately to assess his earning capacity immediately before the emboli.

Accordingly, the order of the Board is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.[31]

*It is so ordered.*

---

**31.** Hastings also claims that he is entitled to attorney's fees, penalty payments, and interest. We affirm the Board's decision in certain respects, but find that we are unable to rule on certain others.

*Attorney's fee.* Hastings objects to the Board's reduction of his requested attorney's fee for work done at the Board level. Hastings also seeks an attorney's fee for work done in this court.

We defer consideration of the latter pending receipt of a timely, documented, motion for fees in this court. Until that is submitted, a request for fees for work done before this court is premature.

We affirm the Board's award of attorney's fees for work done before it. Our review of that award is limited to an inquiry into whether the award was arbitrary or capricious. The Board noted that the primary theory under which Hastings prevailed before the Board— the system of concurrent awards—was that advocated by counsel for the Director. The Board reduced Hastings' attorney's fee award accordingly. We think that counsel for the Director, both before this court and before the Board, has performed superior oral and written advocacy. This has benefitted Hastings in important respects (although the Director's position was not aligned with that of Hastings on every issue). We agree with the Board that this is relevant to the amount of fees that should be awarded Hastings' counsel. Accordingly, we cannot say that the Board's award of fees to Hastings' counsel was arbitrary or capricious, and we affirm.

*Penalty Payments and Interest.* The ALJ noted that a penalty of 10% is payable on compensation awards not paid within 14 days after such became due, unless the employer timely filed notice of controversion. J.A. 26– 28; section 14(e) of the Act, 33 U.S.C. § 914(e) (1976). The ALJ also ordered the payment of 6% interest on any such overdue payments. The Board affirmed the ALJ in each respect, but no amount was set by either the ALJ or the Board. The record before the court does not reveal what payments have been made by the employer, whether the employer timely filed a notice of controversion, or what computations were made by the deputy commissioner with respect to penalties and interest. We accordingly express no view about Hastings' entitlement to these additional amounts. The Board upon remand may be able to clarify the record in these respects and thereby issue a ruling that is susceptible to our review.