366 F.3d 1045
 STEVEDORING SERVICES OF AMERICA; Homeport Insurance Co., Petitioners,
v.
Arel PRICE; Eagle Pacific Insurance Company; Director, Office of Workers Compensation Programs, Respondents.
Arel Price, Petitioner,
v.
Stevedoring Services of America; Homeport Insurance Co.; Eagle Pacific Insurance Company; Director, Office of Workers Compensation Programs, Respondents.
 No. 02-71207.
 No. 02-71578.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 10, 2003.
 Filed May 11, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John Dudrey, Williams Fredrickson, LLC, Portland, OR, for the petitioners and cross-respondents Stevedoring Services of America and Homeport Insurance Company.
 Charles Robinowitz, Portland, OR, for the respondent and cross-petitioner Arel Price.
 Russell A. Metz, Metz & Associates, P.S., Seattle, WA, for the respondents Stevedoring Services of America and Eagle Pacific Insurance Company.
 On Petition for Review of an Order of the Benefits Review Board.
 Before TROTT, FISHER and GOULD, Circuit Judges.
 FISHER, Circuit Judge:
 
 
 1
 This case requires us to decide the proper method for calculating an injured employee's average annual earnings under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq. (2001), and to what extent the LHWCA limits an employee's total disability compensation from multiple awards when the employee has received a permanent partial disability award and a subsequent permanent total disability award. We adhere to our holding in Matulic v. Director, OWCP, 154 F.3d 1052, 1058 (9th Cir.1998), that calculating an employee's average annual earnings under 33 U.S.C. § 910(a) does not excessively overcompensate him when he has worked more than 75 percent of the workdays in the year preceding his injury. Furthermore, we hold that when an increase in an employee's average weekly wage between the time of a prior permanent partial disability and subsequent permanent total disability is not caused by a change in his wage-earning capacity, permitting him to retain the full amount of both awards does not result in any "double dipping." We also hold that 33 U.S.C. § 906(b)(1) delineates the maximum compensation that an employee may receive from each disability award, not from all awards combined.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 On March 27, 1979, Arel Price injured his lower back and elbow when he fell several feet from a broken ladder while working for Stevedoring Services of America ("Stevedoring"). Price was awarded permanent partial disability benefits of $196.01 per week under the LHWCA.[1] SAIF Corporation, the employer's insurance carrier in 1979, is responsible for those benefits. During the year preceding the injury, Price had worked as a longshoreman and a commercial fisherman, earning an average weekly wage of $627.88. Administrative Law Judge Brissenden determined that Price's residual wage-earning capacity after the injury was $333.87 per week.[2] Price returned to work in 1981 as a longshoreman after undergoing decompressive back surgery. He could no longer work as a fisherman because it was too hard on his back, and he was restricted to light jobs as a longshoreman. After another work-related accident in 1991 when a chain fell on him, Price underwent a second decompressive back surgery. Although he returned to work in 1992, Price's back got worse over the years to the point that he was taking pain medication every day on a regular basis. Upon the advice of his doctor, Price stopped working on July 2, 1998.
 
 
 3
 In October 2000, Administrative Law Judge Vittone ("ALJ") awarded Price permanent total disability benefits as of July 3, 1998. He ordered Homeport Insurance Company ("Homeport"), Stevedoring's insurance carrier in 1998, to pay compensation based on Price's 1998 average weekly wage, which the ALJ calculated to be $1156.15 under 33 U.S.C. § 910(a). The ALJ permitted Price to retain his 1979 permanent partial disability benefits but ruled that 33 U.S.C. § 908(a) limits the combined amount of Price's 1979 and 1998 awards to two-thirds of Price's 1998 average weekly wage, relying on our decision in Brady-Hamilton Stevedore Co. v. Director, OWCP, 58 F.3d 419 (9th Cir.1995).
 
 
 4
 The Benefits Review Board ("Board") determined that Price's 1998 average weekly wage was $1525.90, not $1156.15, due to an error in the ALJ's method of calculation under § 910(a).[3] The Board affirmed the ALJ's decision in all other respects. Specifically, with respect to the maximum limit, the Board stated, "[C]oncurrent awards combined cannot exceed 66 2/3 percent of [a] claimant's average weekly wage at the time of the second injury." Applying this limit to Price's case, the Board concluded, "As claimant is entitled to two-thirds of his 1998 average weekly wage as compensation for his permanent total disability, Homeport's liability will be reduced by the amount of the ongoing permanent partial disability payments, as otherwise claimant would receive[] more than that allowed under Section 8(a)."[4]
 
 
 5
 In their petition for review, Stevedoring and Homeport contend that the ALJ and Board applied the wrong statutory provision to calculate Price's 1998 average weekly wage. In his cross-petition, Price argues that Homeport is not entitled to any credit for SAIF's payments to Price.[5] We conclude that the ALJ and Board properly applied § 910(a) to calculate Price's 1998 average weekly wage but erred in reducing Price's 1998 award by the amount of SAIF's payments under his 1979 award.
 
 II. STANDARD OF REVIEW
 
 6
 The Board must accept the ALJ's findings of fact if they are supported by "substantial evidence." 33 U.S.C. § 921(b)(3); Container Stevedoring Co. v. Director, OWCP, 935 F.2d 1544, 1546 (9th Cir.1991). We conduct an independent review of the administrative record to determine if the Board adhered to this standard. Bumble Bee Seafoods v. Director, OWCP, 629 F.2d 1327, 1329 (9th Cir.1980). The Board's interpretation of the LHWCA is a question of law reviewed de novo and is not entitled to any special deference. Stevedoring Servs. of Am. v. Director, OWCP, 297 F.3d 797, 801-02 (9th Cir.2002). We respect the Board's interpretation, however, if it "is reasonable and reflects the underlying policy of the statute." Kelaita v. Director, OWCP, 799 F.2d 1308, 1310 (9th Cir.1986).
 
 III. PRICE'S 1998 AVERAGE ANNUAL EARNINGS
 
 7
 Stevedoring and Homeport claim that the ALJ and Board erred in calculating Price's 1998 average weekly wages. An employee's "average weekly wages" are computed by dividing the claimant's "average annual earnings" by 52 weeks. 33 U.S.C. § 910(d)(1). There are three methods for calculating a claimant's average annual earnings.
 
 
 8
 Under the method prescribed in § 910(a), the ALJ would first divide the actual earnings of the claimant during the 52 weeks preceding the injury by the number of days actually worked by the claimant in that period to obtain the claimant's "average daily wage." Id. § 910(a); see Matulic v. Director, OWCP, 154 F.3d 1052, 1055-56 (9th Cir.1998). Next, the ALJ would multiply the average daily wage by either 260 if the claimant is a five-day worker or 300 if the claimant is a six-day worker to get the claimant's "average annual earnings." 33 U.S.C. § 910(a). Section 910(b) uses a similar formula but computes the claimant's average daily wage based on the earnings of a typical worker in the same class engaged in similar employment in the same general location, rather than the claimant's actual earnings. See id. § 910(b). In contrast, § 910(c) has no fixed algorithm. Instead, it requires the ALJ to establish a figure that "shall reasonably represent the annual earning capacity" of the claimant. Id. § 910(c).
 
 
 9
 The ALJ and the Board used § 910(a) to calculate Price's 1998 average annual earnings. Stevedoring and Homeport argue that the ALJ and Board should have applied § 910(c) rather than § 910(a). Section 910(a) applies when the claimant "worked in the employment in which he was working at the time of the injury ... during substantially the whole of the year immediately preceding his injury." Id. § 910(a). Section 910(b) applies when the claimant did not work in that employment during "substantially the whole of such year." Id. § 910(b). Only if § 910(a) and (b) "cannot reasonably and fairly be applied" does § 910(c) apply. Id. § 910(c); see Matulic, 154 F.3d at 1056.
 
 
 10
 The presumption is that § 910(a) or (b) applies rather than § 910(c). See Matulic, 154 F.3d at 1057. However, sections 910(a) and (b) cannot reasonably and fairly be applied when employment in the industry is "casual, irregular, seasonal, intermittent, and discontinuous," Marshall v. Andrew F. Mahony Co., 56 F.2d 74, 78 (9th Cir.1932); when applying sections 910(a) and (b) would result in "excessive compensation" in light of the injured worker's actual employment record, Duncanson-Harrelson Co. v. Director, OWCP, 686 F.2d 1336, 1342 (9th Cir.1982), vacated on other grounds, 462 U.S. 1101, 103 S.Ct. 2446, 77 L.Ed.2d 1329 (1983); or when there is insufficient evidence in the record to enable the ALJ to make an accurate calculation under sections 910(a) and (b), id.
 
 
 11
 Determining Price's 1998 average annual earnings under § 910(a) would not result in excessive compensation. In Matulic we announced a bright line rule that "when a claimant works more than 75% of the workdays of the measuring year the presumption that § 910(a) applies is not rebutted." 154 F.3d at 1058. Here, the ALJ found that Price worked 197 days during the 52 weeks preceding his 1998 total disability. Because Price is a five-day worker, there are 260 total working days in the measuring year. 33 U.S.C. § 910(a). That means Price worked 75.77 percent of the measuring year (197 divided by 260). Price falls near the line that Matulic drew but clearly within it. Therefore, calculating Price's 1998 average weekly wage under § 910(a) "falls well within the realm of theoretical or actual `overcompensation' that Congress contemplated," and the presumption that § 910(a) applies is unrebutted. Matulic, 154 F.3d at 1058.
 
 
 12
 Stevedoring and Homeport argue, however, that § 910(a) should not apply because "Price's employment was intermittent and casual." A determination of whether employment is casual, irregular, seasonal, intermittent and discontinuous must be "based on the nature of the employment and of the industry itself, not merely on the prior work record of a particular claimant." Palacios v. Campbell Indus., 633 F.2d 840, 843 (9th Cir.1980). Employment in an industry is casual, irregular, seasonal, intermittent and discontinuous when there are fixed, determinable periods of inactivity during the year. See Marshall, 56 F.2d at 77, 79(upholding application of § 910(c) rather than § 910(b) where a "fixed condition" incident to the employment was that "from the middle of May until the fore part of August the work was slack"); Strand v. Hansen Seaway Serv., Ltd., 614 F.2d 572, 573-76 (7th Cir.1980) (holding that § 910(c) rather than § 910(a) applied where the port was closed from December through March because of climatic conditions). When there are fixed, determinable periods of inactivity during the year, section 910(a) or (b) cannot reasonably and fairly be applied because the nature of the employment is such that it cannot afford a full year of work as sections 910(a) and (b) presume. See S.Rep. No. 80-1315 (1948), reprinted in 1948 U.S.C.C.A.N.1979, 1982 ("[Subsection (c)] is used where the employment itself, in which the injured employee was engaged when injured, does not afford a full year of work.").
 
 
 13
 The ALJ's finding that Price's employment was not intermittent and casual is supported by substantial evidence in the record. The record shows that Price's work through the union hiring hall fluctuates in the sense that Price does not always "work the same number of days every week" and "some years are better than other years." However, the flow of work in most employment can wax and wane; this alone does not equate to fixed, determinable periods of inactivity that would prevent § 910(a) from being reasonably and fairly applied. Therefore, the ALJ and Board properly applied § 910(a) to calculate Price's 1998 average weekly wage.
 
 IV. MAXIMUM LIMIT ON CONCURRENT AWARDS
 A. Double recovery
 
 14
 Stevedoring and Homeport argue that if Price's 1998 permanent total disability award is not reduced by the amount of his 1979 permanent partial disability award, his concurrent awards would amount to "double dipping" because his combined compensation would exceed the level of compensation for permanent total disability. Section 908(a) prescribes the amount of compensation for permanent total disability: "In case of total disability adjudged to be permanent 66 2/3 percentum of the average weekly wages shall be paid to the employee during the continuance of such total disability." 33 U.S.C. § 908(a). Absent any double dipping, an employee who sustains more than one type of disability may receive more than one award. See Hastings v. Earth Satellite Corp., 628 F.2d 85, 91 (D.C.Cir.1980). Double dipping occurs when a disability award compensates an employee for a loss of earning capacity that is accounted for in another award. See ITO Corp. v. Green, 185 F.3d 239, 243 (4th Cir.1999); Rupert v. Todd Shipyards Corp., 239 F.2d 273, 276-77(9th Cir.1956). If an employee sustains multiple injuries from a single accident, the rule against double dipping precludes the employee from receiving a permanent partial disability award in addition to a permanent total disability award because the latter "presupposes a permanent loss of all earning capacity." Rupert, 239 F.2d at 276-77 (emphasis added). Complexities arise, however, when the employee has suffered a prior partial disability and is subsequently totally disabled, because the permanent total disability award may be based on a diminished earning capacity resulting from the prior injury.
 
 
 15
 In Brady-Hamilton, we applied § 908(a) to limit awards paid concurrently to a longshoreman who had sustained a permanent partial disability followed by permanent total disability. See Brady-Hamilton, 58 F.3d at 421. In that case, Anderson earned an average weekly wage of $435.93 before his first injury that resulted in permanent partial disability. By the time of his totally disabling injury four years later, Anderson's average weekly wage had increased to $674.72. The Board found that Anderson's higher wages were due to an increase in wage rates and not an increase in Anderson's wage-earning capacity.[6] The Board held that "permanent partial and permanent total disability awards are not permitted in cases where the claimant is shown to have an increase in wage earning capacity following the first injury." Id. We did not disagree with the Board's holding but vacated the Board's ruling because it improperly "made its own finding of fact on the cause of Anderson's higher earnings," which the ALJ had not addressed. Id. at 422. We remanded the case to the Board to instruct "the ALJ to determine the cause of Anderson's increased earnings and make whatever adjustments necessary to insure that the combined disability award does not exceed the statutory limit mandated by Congress." Id.
 
 
 16
 We implicitly recognized that the amount of adjustment needed, if any, depended on the factual determination of the cause of the employee's increase in earnings between the time of his first and second injury. If an employee's increase in earnings is not caused by a change in his wage-earning capacity, allowing the employee to retain the full amount of both awards does not result in any double dipping. The reason is that the prior partial disability award compensates the employee for the reduction in his wage-earning capacity from the first accident, and the subsequent permanent total disability award compensates the employee for what remains of his earning capacity after that accident. See Hastings, 628 F.2d at 91. Taken together, the awards do not compensate the employee for more earning capacity than he has actually lost. In comparison, a double dipping problem would arise if a change in conditions since the first accident has mitigated or eliminated the prior injury's negative economic effect on the employee's ability to earn wages. In that case, because the first award overestimated the effect of the first injury on the employee's wage-earning capacity, combining the full amounts of the first and second award would end up compensating the employee for more wage-earning capacity than he has actually lost.
 
 
 17
 The following hypotheticals will illustrate why this is so. Suppose employee A works 40 hours per week at a wage of $25 per hour. His average weekly wage would be $1000.[7] The worker then suffers a permanent partial disability that restricts the number of hours that he is physically capable of working to 25 hours per week, reducing his earning capacity to $625 per week. His diminution in earning capacity is $375 ($1000-$625). Consequently, he would be entitled to a permanent partial disability award of $250 per week (two-thirds of $375). See 33 U.S.C. § 908(c)(21). Ten years later, he is in actuality no longer physically restricted by his disability to working 25 hours per week and now works more hours than he did before his first injury, 48 hours per week, at the same wage rate. His average weekly wage would be $1200. A second accident then occurs, causing permanent total disability. As a result, he would be entitled to a permanent total disability award of $800 per week (two-thirds of $1200). See id. § 908(a). His two awards combined would total $1050 ($250 plus $800).
 
 
 18
 However, $1050 would overcompensate the employee by $250. The $250 partial disability award is designed to compensate the employee for his supposed $375 loss in earning capacity from the first accident, but his $1200 average weekly wage prior to the second accident also reflects that "lost" earning capacity because, since the first accident, he has recovered his physical ability to work 40 or more hours per week. Thus, the permanent total disability award would compensate the employee for a $375 loss in earning capacity that is already compensated by the prior permanent partial disability award. Under these circumstances, the employee's combined compensation of $1150 should be reduced by $250 (two-thirds of $375) to avoid double dipping.
 
 
 19
 Now compare a hypothetical employee B who is similarly situated to A. Like A, employee B starts out with an average weekly wage of $1000 and suffers a $375 diminution in earning capacity due to the first injury. Then his average weekly wage increases to $1200 prior to his second injury. B's combined awards would be the same as A's: $250 for the permanent partial disability and $800 for the permanent total disability. Unlike A, however, B has not experienced an increase in wage-earning capacity between the two injuries. He continues to be restricted by his disability to working 25 hours per week. However, his average weekly wage has risen between the time of his first and second injury because wage rates have increased from $25 to $48 per hour due to inflation.[8]
 
 
 20
 In this second scenario, there is no double dipping because employee B's $1200 average weekly wage in the year preceding his second injury still reflects a diminished earning capacity due to his previous partial disability. Had he not suffered a prior partial disability, he would be capable of earning $1920 at the higher wage rate (40 hours times $48 per hour) rather than $1200 (25 hours times $48 per hour). The first injury continues to affect adversely B's ability to earn wages at the time of his second injury. Consequently, his $800 permanent total disability award does not compensate him for any loss in wage-earning capacity that is already compensated by the prior $250 permanent partial disability award. The $250 permanent partial disability award is designed to compensate him for his $375 diminution in earning capacity resulting from the first injury, and the $800 permanent total disability award compensates him for his residual earning capacity of $625, which translates into higher nominal dollars at the time of the second accident due to inflation. Because there is no double dipping, no adjustment to either award is required.
 
 
 21
 In sum, when an employee's earnings have increased between the time of a prior permanent partial disability and subsequent permanent total disability, permitting him to retain the full amount of both awards does not result in any double dipping if the employee's increase in earnings were not caused by a change in wage-earning capacity.[9] There is no double dipping because the employee's permanent total disability award is based on a diminished earning capacity resulting from the previous partial disability. Without the prior disability, he would be capable of earning more than he was making at the time of the second injury. Thus, the permanent total disability award does not compensate the employee for any loss in wage-earning capacity that is already compensated by the prior permanent partial disability award.
 
 
 22
 Here, Price's average weekly wage increased from $627.88 to $1525.90 over a span of almost 20 years from 1979 to 1998. The fact that Price's 1998 average weekly wage exceeds the nominal value of his 1979 average weekly wage does not alone determine whether concurrent awards would constitute double recovery. That determination depends in part on the cause or causes of the increase in earnings. The ALJ found that Price's increase in earnings was not due to an increase in wage-earning capacity, a finding that was not challenged before the Board or before this court. Because of the ALJ's finding, the Board recognized that "there is no basis for reducing the 1979 award," but it went on to conclude that "it is the second [1998] award that must be reduced to avoid over-compensation." This conclusion was erroneous because an employee is not over-compensated when the employee's increase in earnings is not caused by an increase in wage-earning capacity. Because Price's wage-earning capacity did not change between the time of his 1979 and 1998 awards, permitting Price to retain the full amount of both awards would not double-compensate him for any loss in wage-earning capacity. The ALJ and Board therefore erred in reducing Price's 1998 award by the amount of his 1979 award.
 
 B. Maximum compensation under § 906(b)(1)
 
 23
 In addition to limiting Price's total compensation under Brady-Hamilton, the Board held that the combined amount of Price's awards also could not exceed the maximum compensation rate under 33 U.S.C. § 906(b)(1). Section 906(b)(1) states, "Compensation for disability or death ... shall not exceed an amount equal to 200 per centum of the applicable national average weekly wage...." 33 U.S.C. § 906(b)(1).[10] Price contends that § 906(b)(1) demarcates the maximum amount of each of his awards individually, not the total amount of both awards after they are combined. We agree.
 
 
 24
 The difference in interpretations is demonstrated by the numbers. At the time of Price's 1998 injury, 200 percent of the national average weekly wage was $835.74. See Division of Longshore and Harbor Workers' Compensation, U.S. Dep't of Labor, National Average Weekly Wages, Minimum and Maximum Compensation Rates, and Annual October Increases ("National Average Weekly Wage Tables"), at http://www.dol.gov/esa/owcp/dlhwc/NAWWinfo.htm (last visited Apr. 19, 2004). Under the Board's decision, Price's combined compensation of $1213.28 from both awards ($196.01 plus $1017.27) would be limited to a total of $835.74.[11] In contrast, under Price's interpretation, his 1998 award of $1017.27 would be limited to $835.74. However, he would receive the full amount of his 1979 award of $196.01 because it falls below the $835.74 maximum, and his combined compensation from both awards would be $1031.75 ($196.01 plus $835.74).
 
 
 25
 To determine which is the proper interpretation of the LHWCA, we look first to its plain language. Bowen v. Director, OWCP, 912 F.2d 348, 351 (9th Cir.1990). Section 906(b)(1) refers to "[c]ompensation for disability," but does not specify whether it is referring to compensation from an award or rather from all awards. However, Congress used the phrase "compensation for disability" elsewhere in the LHWCA when referring to compensation from a single award. "[I]dentical terms within an Act bear the same meaning." Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 479, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). For example, § 919(f) says, "An award of compensation for disability may be made after the death of an injured employee." 33 U.S.C. § 919(f) (emphasis added). In addition, § 908 states, "Compensation for disability shall be paid to the employee as follows...." It then identifies four different types of disability and prescribes the amount of compensation for each type.[12] If an employee suffers more than one type of disability, he may receive multiple awards under § 908, subject to the rule against double recovery, discussed previously. See Hastings, 628 F.2d at 91. Thus, § 908 delineates the amount of "compensation for disability" that shall be paid under an award for each type of disability. Therefore, we construe the same phrase in § 906(b)(1) to refer to the maximum compensation allowed from an award, not all awards to an employee.
 
 
 26
 The legislative history buttresses the conclusion that § 906(b)(1) is not an overall limitation on all disability awards given to an employee for multiple, successive injuries. Prior to 1972, the maximum compensation rate under § 906(b)(1) was fixed at $70 per week. In 1972 Congress amended § 906(b)(1) to resemble its current form by pegging the maximum compensation rate to a multiple of the national average weekly wage. See Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972("1972 Amendments"), Pub.L. No. 92-576, sec. 5(a), 86 Stat. 1251, 1252.[13] In describing the general purpose of the amendments, the House Report stated, "It is important to note that adequate workmen's compensation benefits are not only essential to meeting the needs of the injured employee and his family, but, by assuring that the employer bears the cost of unsafe conditions, serves to strengthen the employer's incentive to provide the fullest measure of on-the-job safety." H.R.Rep. No. 92-1441 (1972), reprinted in 1972 U.S.C.C.A.N. 4698, 4699. The Committee also noted that, historically, an employee's compensation award was subject to the § 906(b)(1) limitation "in order to protect against a high compensation payment for injuries to highly paid workers." Id. at 4700.
 
 
 27
 Although serving this latter purpose, the Board's interpretation of § 906(b)(1) contravenes a more fundamental purpose of the 1972 Amendments. If § 906(b)(1) were read to restrict the total compensation that an employee can receive from all awards, the LHWCA would fail to provide employers an incentive to ensure the safety of a formerly injured employee who is already receiving an award that meets the § 906(b)(1) amount. For example, suppose employee D earns an average weekly wage of $4500 per week. He is injured in July 1998 and suffers a $3000 loss in earning capacity due to a permanent partial disability. His award would be $2000 (two-thirds of $3000) absent any statutory maximum. See 33 U.S.C. § 908(c)(21). However, § 906(b)(1) would limit his compensation to $835.74 (200 percent of the prevailing national average weekly wage). See National Average Weekly Wage Tables. Later that year, the employee is totally disabled in a second accident. He would receive a second permanent total disability award of $1000 (two-thirds of his residual earning capacity of $1500), absent the statutory maximum; but under the Board's interpretation of § 906(b)(1), the employer does not have to pay a penny more for the second accident because the employee is already receiving $835.74 in weekly payments from the first award. Consequently, the employer does not bear the costs of the unsafe conditions that caused the second accident.
 
 
 28
 On the other hand, reading § 906(b)(1) to limit only the amount of compensation from each disability award will still accomplish the purpose of protecting employers against a "high compensation payment for injuries to highly paid workers," H.R.Rep. No. 92-1441, reprinted in 1972 U.S.C.C.A.N. at 4699, because the provision would treat a highly paid employee who earns an average weekly wage over 300 percent of the national average weekly wage as if he earns a lower average weekly wage.[14] At the same time, an employer would have an incentive under § 906(b)(1) to prevent future injuries to formerly injured employees because the employer bears some liability for future accidents. For example, in our previous hypothetical, the employer would have to pay $835.74, but not $1000 based on the employee's true earnings, for the second accident. Thus, the employer would bear some cost for the unsafe conditions that engendered the second accident, although not as much as without the § 906(b)(1) limit.
 
 
 29
 Our interpretation of § 906(b)(1) is consistent with those of other circuits. In Hastings v. Earth Satellite Corp., 628 F.2d 85 (D.C.Cir.1980), the D.C. Circuit posited in dicta that § 906(b)(1) imposes a ceiling on each disability award given to an employee who has been injured successively, rather than all awards combined. See id. at 91. The court acknowledged that this interpretation "might give rise to an anomaly, namely, that a twice-injured, permanently disabled worker might receive a larger award than a worker who had become permanently disabled in a single injury." Id. For instance, our hypothetical employee D would receive $1671.48 if he were injured twice and only $835.74 if he were totally disabled in a single accident. Nevertheless, the court concluded, "This specter does not indicate a flaw in the system of concurrent awards; rather, it is caused by the existence of the Act's maximum-payment provisions. Congress is free to amend the statute to eliminate the resulting anomaly." Id. When Congress subsequently amended § 906(b)(1) in 1984, it did not alter the provision's language in such a way as to eliminate the resulting "anomaly" or otherwise cast doubt on the propriety of the D.C. Circuit's interpretation. See Longshore and Harbor Workers' Compensation Act Amendments of 1984, Pub.L. No. 98-426, sec. 6, 98 Stat. 1639, 1642. On the contrary, as we have explained, that an employer may pay more to a permanently disabled worker for injuring him twice than to a worker who has become totally disabled in a single injury is consistent with Congress' intent to provide incentives for employers to ensure on-the-job safety.
 
 
 30
 We hold that § 906(b)(1) defines the maximum compensation from each award, not from all awards combined. This conclusion is consistent with the plain language of the LHWCA and effectuates the underlying policy of the act by shielding employers from high compensation payments for injuries to highly paid workers while providing employers an incentive to prevent future injuries to formerly injured employees. The Board erroneously applied § 906(b)(1) to limit the total, combined amount of Price's permanent partial disability award and subsequent permanent total disability award.
 
 
 31
 Costs on appeal shall be awarded to Price and be borne equally by Homeport and Eagle Pacific Insurance Company.
 
 
 32
 Petition GRANTED. AFFIRMED in part and REVERSED in part.
 
 
 
 Notes:
 
 
 [1]
 The 1979 award is not at issue in this case, but the amount of his previous award is relevant in determining the appropriate compensation for Price's present claims
 
 
 [2]
 The award was calculated by subtracting Price's residual wage-earning capacity from his pre-injury average weekly wage: $627.88-$333.87See 33 U.S.C. § 908(c)(21). This yields Price's loss of wage-earning capacity, $294.01, which is multiplied by two-thirds as required by the LHWCA to obtain the award of $196.01. See id.
 
 
 [3]
 To determine Price's 1998 average weekly wage, the ALJ took Price's actual earnings in the preceding year $60,119.97 and divided by 52 weeks to get an average weekly wage of $1156.15. However, the Board noted that under § 910(a) the ALJ should have taken Price's actual earnings, $60,119.97, and divided by the number of days Price actually worked, 197, to get his average daily wage of $305.18See 33 U.S.C. § 910(a). Then, the ALJ should have multiplied Price's average daily wage by 260 because Price was a five-day worker to get his average annual earnings of $79,346.80. See id. Finally, the ALJ should have divided Price's average annual earnings by 52 to obtain an average weekly wage of $1525.90. See id. § 910(d). The parties do not dispute that the calculation of Price's average weekly wage under § 910(a) yields a figure of $1525.90, not $1156.15. However, they dispute whether § 910(a) should govern the calculation of Price's average weekly wage. See infra at 5997-99.
 
 
 [4]
 "Section 8(a)" refers to the section of the LHWCA itself, which was codified at 33 U.S.C. § 908(a)
 
 
 [5]
 Homeport and Price have raised other challenges to the ALJ's and Board's decisions, which we address in a separate memorandum filed contemporaneously with this opinion
 
 
 [6]
 "[H]igher wages do not necessarily prove an increase in wage-earning capacity."Metropolitan Stevedore Co. v. Rambo, 515 U.S. 291, 301, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995) ("Rambo I"). A change in wage-earning capacity includes "a change in [the employee's] physical condition, skill level, or the availability of suitable jobs." Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 130 n. 3, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) ("Rambo II").
 
 
 [7]
 Assuming that the employee works an eight-hour day, his average daily wage would be $200 (8 times $25). Multiplying his average daily wage by 260 yields his average annual earnings of $52,000See 33 U.S.C. § 910(a). Dividing his average annual earnings by 52 produces his average weekly wage of $1000. See id. § 910(d)(1).
 
 
 [8]
 These hypotheticals merely illustrate the clear cases of what constitutes a change in wage-earning capacity and what does not. An employee's wage-earning capacity can change without a change in the employee's physical condition,see Rambo I, 515 U.S. at 301, 115 S.Ct. 2144, and an employee's wage-earning capacity may remain the same despite an increase in actual wages for reasons other than inflation. "There may be cases raising difficult questions as to what constitutes a change in wage-earning capacity, but we need not address them here." Id.
 
 
 [9]
 We do not suggest that if the employee's wage-earning capacity has changed, there would necessarily be a double dipping problem. There may be cases in which the employee's earning capacity has changed in some way, yet the employee's prior injury continues to have a negative economic effect on his ability to earn wages. It suffices for present purposes to note that if the employee's wage-earning capacity hasnot changed, no danger of double dipping exists.
 
 
 [10]
 The Secretary of Labor determines the national average weekly wage annuallySee 33 U.S.C. § 906(b)(3).
 
 
 [11]
 Price's maximum compensation would not be fixed at $835.74 but rather would change annually with changes in the national average weekly wageSee 33 U.SC. § 906(c).
 
 
 [12]
 Specifically, § 908 reads:
 Compensation for disability shall be paid to the employee as follows:
 (a) Permanent total disability: In case of total disability adjudged to be permanent 66 2/3 per centum of the average weekly wages shall be paid to the employee during the continuance of such total disability....
 (b) Temporary total disability: In case of disability total in character but temporary in quality 66 2/3 per centum of the average weekly wages shall be paid to the employee during the continuance thereof.
 (c) Permanent partial disability: In case of disability partial in character but permanent in quality the compensation shall be 66 2/3 per centum of the average weekly wages....
 (e) Temporary partial disability: In case of temporary partial disability resulting in decrease of earning capacity the compensation shall be two-thirds of the difference between the injured employee's average weekly wages before the injury and his wage-earning capacity after the injury....
 33 U.S.C. § 908.
 
 
 [13]
 The 1972 version of § 906(b)(1) provided a phase-in period to ease the adjustment of the increase in the maximum amount of benefitsSee 1972 Amendments, sec. 5(a); H.R.Rep. No. 92-1441 (1972), reprinted in 1972 U.S.C.C.A.N. 4698, 4700. During this phase-in period, the maximum compensation rate was gradually increased each year from 125% of the national average weekly wage in 1973 to 200% of the national average weekly wage by 1975. See 1972 Amendments, sec. 5(a). In 1984, Congress simplified the provision to its current form, setting the cap at 200% of the national average weekly wage and extending the limitation to death benefits. See Longshore and Harbor Workers' Compensation Act Amendments of 1984, Pub.L. No. 98-426, sec. 6, 98 Stat. 1639, 1642.
 
 
 [14]
 An employee who earns over 300% of the national average weekly wage would be limited by § 906(b)(1) to compensation of 200% of the national average weekly wage (two-thirds of 300% is equal to 200%)